SmileDirectClub, LLC v. Candid Care Co., Mr. Papacostas. Good morning and thank you, Your Honor. Simeon Papacostas representing Appellant SmileDirectClub. The patent at issue in this case claims subject matter that is patent eligible. Specifically, the 522 patent covers improvements to processes and systems for manufacturing personalized sets of aligners that are a set of tangible and physical products which are meant to reposition a patient's teeth, manufactured based on a set of inputs that are claimed within the processes and systems at issue here, and that when made according to these patented processes and systems, not only saves patients time and money, but also can reduce the risk of errors happening in the molding process. At bottom, this is a case about whether SmileDirectClub failed to state a claim at the outset, as this was a motion dismissed under Rule 12b. Not about whether SmileDirectClub failed to prove its case. That's why the standard of review for a 12b6 motion is what it is and why it matters that the district court failed to properly apply the standard when it engaged in improper affirmative fact-finding. In addition to its general factual misstatements of the record before it, the district court's opinion went well beyond the appropriate legal framework for Rule 12b6 analysis. Substituting its own fact-finding and or adopting Candid's attorney argument in place of well-pleaded factual allegations in the complaint, as well as the facts characterizing the prior art and the benefits of SmileDirectClub's patented solution stated right in the patent. As one example, the district court misread and misstated the purpose of the 5C2 patent as being directed solely to teleorthodontics or telehealth business methods, or in a longer version of that, merely arranging for patients to receive aligners without ever having to physically see a dental professional. While that's one aspect of the claimed methods and systems, that's a wrong oversimplification of the patent because it ignores that this patent covers systems and methods for producing aligners for repositioning one or more teeth in a patient's mouth. It's the first sentence in the summary of the invention in the specification and it's claimed. The district court missed this entirely and contradicted itself in its own opinion. For example, the court concluded at one stage at appendix page 20 of the district court's opinion that, quote, the claims do not disclose a method for manufacturing dental aligners, end quote. But earlier conceded that, quote, and this is at appendix page 15, the claims themselves require either the production of aligners or a system for fabricating aligners. The district court also concluded that the 5C2 patent does not teach a manufacturing process but instead describes a workflow that enables a patient without seeing an orthodontist in person to arrange for an intraoral scan that is subsequently used to manufacture and deliver aligners. But those steps for generating a treatment plan and manufacturing aligners based on that plan as well as delivering the aligners are claimed steps in the process. The district court again erred when it found that the 5C2 patent contained only three lines of, quote, general statements, end quote, on fabricating aligners. That ignores not only the three provisional applications incorporated by reference but in fact ignores specific claim language such as that of dependent claim seven which describes specific materials and a specific way to fabricate the aligners. The district court also misstated the record regarding the party's arguments when the court stated that neither party takes a position on whether the claims should be read to require a particular order. After previously acknowledging that SDC, Smile Direct Club, argues that it is necessary to determine whether the steps of the claim methods must be performed in a particular order. And in general, the district court overgeneralized the field of teleorthodontics in a matter so broad as to strip it of all meaning. These are fundamental misreadings and misstatements of the record which all but ensured that the district court would begin its analysis with a flawed premise and arrive at erroneous conclusions. The district court made many factual findings that it just wasn't entitled to make on the record on a Rule 12b6 motion. Chiefly among them was its opinion that the claim systems and methods were routine, conventional, and well understood. These go directly against the factual allegations in the complaint as well as statements in the patent itself. There's no evidence that the actual distribute and order combination of the steps itself was conventional. The only way to derive it... This is just Toronto. Can I just ask, if all of the steps were properly described as, I think the phrase that we've used and the Supreme Court referred to in Alice, a method of organizing human activity, and it really doesn't matter whether they're conventional, right? Because that's just on the abstract side of the line. Correct. That goes to the step one of the inquiry, Your Honor. And if all of the steps were a method of organizing human activity, then that's right in line with Alice, as you mentioned, Your Honor. However, knowing that the district court focused on some steps regarding making appointments, the district court did not look at the claims as a whole when it characterized the idea that the patent is directed to as merely teleorthodontics or having patients arrange for receiving aligners without ever seeing a desk professional. There are concrete steps that are right there in every independent claim. What are the ones you have in mind? I'm sorry, Your Honor, I missed that. What are the concrete steps that you just referred to? Well, certainly, Your Honor, starting from making the appointment, we've pled in the complaint that using this appointment management system was revolutionary in the industry. Right, but I guess all I'm just trying to figure out is this. One can describe a method of organizing human activity at various levels of detail. At a high level, one can say telecommunication orthodontic or something. At a more specific level, you can say sending a message to make an appointment, showing up for the appointment, et cetera, different levels of specificity, but all still within the world of methods of organizing human activity. There's nothing here about the physical construction of the aligners. Let's call that manufacturing. That's asserted to be new. Well, I would take that in two points. First of all, making the aligners themselves and generating the treatment plan are concrete steps, whether they're asserted to be new or not. The idea that, and I think it's important here to also step back, the idea here is not just that a patient gets a 3D scan of their teeth and the resulting aligners are a sort of eye-to-eye or a sort of exact replica of the three-dimensional data. The way that the patent describes generation of the treatment plan in column 15 is such that you get the 3D data, the dental professional is looking at that data, is able to manipulate it to a sort of desired endpoint. Then through various certain embodiments can generate, the treatment plan may be generated, could be automatically generated by a computer according to a set of rules, such as every two weeks, for example, that a tooth can't move more than three millimeters. That's a specific example of a rule that's in the specification in column 15. The patient receives a set of aligners in stages. That's also captured by the claims and some of the dependent claims. In those stages, each one of those stages, you have a physical set of aligners that's custom-made to patient's teeth based on a treatment plan that's made to reposition those teeth in stages. You can see you have physical aligners that are produced based on this process, and you have a tangible result with the patient's teeth based on the use of this process. It's very difficult to look at these claims as a whole and just cast them, as the district court did, as merely methods of organizing human activity. We would vehemently disagree with that conclusion. That conclusion can only be reached by taking parts of these claims in isolation and ignoring other parts. The Supreme Court, way back in Diamond v. Deere, warned that it's inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis. Right, but then some people might say, and I think it's not an unfair characterization, that the single largest change that Mayo made in 101 law is precisely to insist on dissecting the claim, not ignoring the rest, but dissecting it for purposes of analysis to identify what is asserted as the advance and then seeing if, now we're not ignoring the rest, seeing if the rest actually is an inventive contribution. Because obviously there was lots of physical stuff going on in Mayo, but the only advance was this law of nature of identifying when certain levels were too high and certain levels were too low. But it's not like there's nothing physical going on. You do have to dissect it for analysis purposes, isn't that right? You just can't ignore the rest. I'm sorry, I didn't mean to interrupt you, Your Honor. No, please go ahead. Sorry. I think, of course, you're correct, Your Honor, that the first step in the analysis is dissecting this. But I think that it's error to look at only parts of these claims, then look at that and hyper-focus on a certain part of the claim without context or without considering how that informs the rest of the idea. And the idea here that this patent claims, the 522 patent, is that it's an improved method for producing liners. Now, there are various inputs and there are various ways to get into that go into the steps that go into the 3D scan and then the steps that go into the generation of the treatment plan and then manufacturing of the liners based on the treatment plan. And especially in the complaint, it has allegations that talk about what the benefits of those are, and I know that's getting more into the step two part of the analysis. But also, the patent itself describes the prior art method in a way. I'm sorry, Joe. It's Judge Clemens. I was just trying to interrupt you, sir, Mr. Pepikakis. Going back to the conversation that you were having with Judge Toronto a minute ago talking about dissection, what, in your opinion, is the advance over the prior art in the claim patent? Or you haven't had any specific discussion yet over what the advance over the prior art was? Right. So that is actually discussed right there in the patent in the background. It talks about the prior art. Prior to the invention, the dental impressions were made in a dental office. I'm sorry, my time is up. Please respond. Is the elimination of the visit to the dentist or the orthodontist, is that the advance over the art? That is a part of the advance over the art and the effect that that has on the efficiency and the cost and the time cost. I'm just interested in the advance, not in the effects of the advance. What specifically is the advance over the prior art? Yes, the advance over the prior art here is the reduction of steps in the prior art methods and processes, and that is captured by part of the claim. And what's the specific step that's reduced? There's an elimination. So as the patent describes in the background of the invention right there in column one, there were many patients who were required to return to the dental office to have many impressions made. The impressions included any errors such as incomplete impressions or other areas that patients would be required to go to the dentist again. If the dental professional used the impressions in the course of administering a continuing treatment plan, the patient would be required to undergo many checkup appointments at the dental office. The dental professional would track the treatment in person and modify it as necessary. So these are conventional methods in the prior art that were labor and cost intensive for both patients and the dental professionals. So what the 5C2 patent did by eliminating some of those steps and arranging components of the claim system in an unconventional manner is that it's a now method and system for producing aligners. It eliminates some of those prior steps required to design, produce, and distribute the aligners, and that's the advance over the prior art methods. That's all that was in the record about that, and those were the facts that the district court was required to credit as true on Rule 12b6 motion. It didn't do that, and I understand my time's up, Your Honor. Okay. Any questions for Mr. Papacostas at this stage? All right, we'll save your rebuttal time. Let's hear from Mr. Sandinato. Thank you, Your Honor, and may it please the court, Mike Sandinato for Defendant Candid Care Company. Your Honors, there are some Section 101 cases that present close calls. This one is not. In some cases, it can be a challenge to identify what the abstract idea is or, indeed, if there's an abstract idea at all. Here, it jumps off the page. The abstract idea is this teleorthodontics that the Delaware court found. This phrase, without a dentist or orthodontist physically seeing the user, is repeated no less than three times in Claim 1. In some cases, it can be a challenge, especially on a motion to dismiss, to determine whether the claim includes anything beyond the well-understood, routine, and conventional. Here, that's easy. The specification tells us that the patent does not teach any advances in the way the scan is conducted or the way the aligners are produced. The computer elements are all conventional. The communication elements are all conventional. And SDC is not alleging that it made any improvements in those areas. Plain and simple, this is a patent about the workflow, not a patent about any improvements in the technology. So we start with Alice, Step 1, of course, are the claims directed to an abstract idea? And as Judge Toronto correctly pointed out, the way you do that is to see or look at what the focus of the claimed advance is. And here, there's no question that the focus of the claimed advance is this concept of eliminating the co-location of the dentist and the patient. And the specification confirms this. The specification confirms that the only possible advance is this abstract idea itself. If we look at the passage that opposing counsel was looking at a few moments ago, this is at appendix page 38, line 1, excuse me, column 1, lines 38 to 54 of the specification, the problem discussed has to do with the problem of perhaps the molds have errors in them. And the patent observes that that could require the user to go back to the dentist multiple times. And so it's observing a problem in the workflow. And the solution it's offering is, once again, to eliminate this co-location between the dentist and the patient. The prosecution history confirms this. During the prosecution of this application, the applicants were faced with a rejection over the Breland prior art. SBC, in arguing over Breland, did not point to any technical improvements. It pointed only to this without the user physically or at the dentist, excuse me, physically seeing the user limitation. And I would direct the court to appendix page 136, where the applicant stated, paragraph 53 of Breland clearly requires the patient to attend a meeting with the treating professional, at which point the treating professional physically sees the patient. It went on to argue that, unlike Breland, our claim, amended claim 1, recites the approval is received without the dental or orthodontic professional having physically seen the user. SDC's complaint confirms this. SDC refers, this is appendix page 57 at paragraph 3, SDC's complaint refers to what it calls its revolutionary workflow as a key technological contribution. Appendix page 60 at paragraph 16 of the complaint, SDC refers to, or SDC states that its model revolutionized the way doctors interact with patients by eliminating the need for the dentist or orthodontist to see the patient in a brick-and-mortar setting and to instead see them using today's technology. This is exactly the abstract idea that the Delaware court identified, and this phrase, today's technology, is especially important. It underscores that all SDC did here was build a workflow around existing technology. If we need to look any further, SDC's blue brief confirms this. SDC's blue brief at page 4 refers to, by contrast, the 522 patent discloses systems and methods for manufacturing aligners using a distributed impression generation analysis without a dentist or orthodontist physically seeing the user. All of the evidence we have here speaks with one voice, and that voice tells us that this is a patent about an abstract idea. So then we get to ALICE Step 2. Do the claims contain an invented step? And here, the answer is clearly no. The claims involve routine scanning, generic computers, and conventional manufacturing processes. And contrary to opposing counsel, the Delaware court did not engage in any impermissible fact-finding to determine that. As to scanning, I'd reference the court to appendix page 44, which is the patent at column 14, lines 4 to 5. The patent states that such scanning capabilities presently exist through the use of the iTero scanner. The iTero scanner is an off-the-shelf scanner that's made by a company called Align. As to computer systems, appendix page 47, patent at column 19, lines 63 to 67, the embodiments of the present disclosure may be implemented using existing computer processors. And then as to producing aligners, which is the step I think that SDC focuses the most on, there is an utter lack of detail in the claims and the specification on the manufacturing process. And importantly, SDC is not alleging or arguing that it invented anything new with respect to manufacturing. And SDC's reply brief is complete with concessions, with admissions, that the technological elements of these claims were well known. So if we look at the yellow brief at page 24, SDC refers to the unremarkable fact that existing equipment may be utilized for steps requiring, for example, computers or intraoral scanners. Yellow brief at page 25, SDC concedes that its workflow may be implemented using routine scanning technology, generic computers, and routine communication technology. And lastly, and this goes to the manufacturing step, the so-called manufacturing step, SDC concedes that fabricating aligners was, and I'm quoting here, a well-known orthodontic practice. This step of producing aligners cannot save SDC's claims, and that's because it's just one of multiple generically described steps in this overall workflow. The claims do not describe, as they would be required to do, a step-by-step method for producing aligners. The claims simply say, produce them. And this is in very sharp contrast to the cases that SDC cites in support of its case. So in Diamond v. Deere, for example, which opposing counsel referenced, there there was a step-by-step process for curing rubber. As the court found, it began with the loading of a mold with raw, uncured rubber, and it ended with the eventual opening of the press at the end of the cure. The Nike case was similar. The Nike case, the patent involved or claimed a step-by-step process for incorporating a textile element into an article of footwear. We just don't have those kinds of things here. All we have is the very generically recited step of producing aligners. Now I'd like to address some of the points that SDC has made in both their opening brief and their reply brief. And the first one I'd like to address is this argument that the Delaware court did not apply the proper presumption of validity. And on this, Your Honor, it's of no moment that the Delaware court here did not expressly recite or reference the clear and convincing standard. The Delaware court did acknowledge that standard at the hearing on this motion to dismiss. And the Delaware court's opinion, as I believe this court will recognize, is extremely thorough. The Delaware court's written opinion recites the standard on a motion to dismiss. The Delaware court's opinion here recites the standard for a section 101 analysis. And the Delaware court carefully considered and rejected all of SDC's arguments, including its argument that fact discovery and claim construction were necessary here. I heard opposing counsel, SDC's counsel, make reference to an argument it made that the claim construction needed to be undertaken to address whether the steps needed to be performed in a certain order. The Delaware court considered that and rejected that. And the reason the Delaware court rejected it is because although SDC raised the issue in opposing the motion to dismiss, it never explained why the question of whether or not the steps needed to be performed in a certain order was of any importance. So the Delaware court looked at and carefully examined all of SDC's arguments on the motion to dismiss, applied the proper presumption of validity standard, applied the proper clear and convincing standard, and found these claims to be patent ineligible. Next point I'd like to address is this argument that the USPTO's issuance or allowance of a subsequent application, an application that issued as the 599 patent, should somehow, should have swayed the Delaware court and should sway this court that these claims are in fact patent eligible. And of course neither this court nor the Delaware court are bound by an ex parte determination of a USPTO examiner. There is of course a certain presumption that attaches to the allowance of claims by virtue of the examiner's decision. The Delaware court recognized that presumption. But that presumption is overcome whereas here you have overwhelming evidence that this patent is claiming ineligible subject matter. SDC argues in its reply brief that the Delaware court failed to credit SDC's allegations in the complaint and their factual statements. Their problem is that the complaint does not allege any technological improvements. At most the only advantage that the complaint alleges is benefits that flow from this abstract idea of, again, removing the co-location of the dentist and the patients. SDC makes reference in their reply brief to allegations of SDC's proprietary and cutting edge technology. These allegations, once again, they're going to the platform, not the underlying technology. And in any case a bald reference to innovative or cutting edge technology is much too general to be credited as somehow providing a technological solution. SDC argues in this one I think the point is very interesting. SDC argues that the Delaware court did not find that any factual allegations in SDC's complaint were implausible or contradicted. And really that's exactly our point. It wasn't necessary for the Delaware court here to reject any of the allegations in the complaint to find the 522 patent invalid because the complaint never alleged any true technological improvements. Nor could it. Nor could it because it didn't make any. Once again, this patent is solely about the workflow, solely about the abstract idea. Judge Clevenger properly asked opposing counsel about what is the advance here? What really is the advance here? And the only possible advance here is the movement from a workflow where patients and dentists were in the same room, where a dentist physically sees the patient, to a different workflow where the patient and the dentist never see one another. So to be honest, for all those reasons, we strongly believe that the Delaware court here got it right and that this is a very, very clear case of Section 101 patent eligibility and the court properly granted our motion to dismiss. Okay. Any more questions for Mr. Fandanato? No. Okay. All right. And for rebuttal, Mr. Papacostas, you have three minutes. Thank you, Your Honors. I think we just heard the question was, what's the advance here? And we need to be careful during a Section 101 analysis to not conflate that with a novelty analysis. Even if the advance is, as the district court alleged and as we've identified, a unconventional arrangement resulting in having a dental professional remote, having the treatment plan generated in an automated way that goes right into the fabrication of the aligners. This is still a patent that's directed to producing a tangible, physical product, and that product is based on inputs that are personalized and specific to the user. And this product is not just merely a replication of a sort of transferring one form of data to an exact replication or another. This is creating aligners that are specific, that are in stages, and that are informed by a set of rules. And so even if the advance over the prior methods is no longer co-locating a dental professional in the same office, that doesn't make this patent only about teleorthodontics, and it doesn't make this patent any more abstract when you have physical aligners. The second thing I'd like to address, because I didn't get a chance to discuss the Step 2 analysis, at bottom, what we heard just now, are a lot of issues of fact. It's well settled that elimination of previously required steps may be the improvement. The Federal Circuit and Rapid Litigation Management emphasize that Step 2 may find an inventive concept in a new combination of steps, even though all the constituents of the combination were well known and in common use before the combination was made. And BASCOM tells us the inventive concept inquiry requires more than recognizing that each claim element by itself was known in the art. But once again, at a minimum, we have issues of fact as to whether the reduction of certain steps, or whether the unconventional arrangement of having a dental professional remotely, resulted in something that was well known or routine or something that was inventive. There's nothing in the record that indicates that the system or the process in its ordered combination was conventional or well known. And that's a mistake that opposing counsel just made, and that mirrors the mistake that the District Court made in its analysis when it viewed each element in isolation and concluded, based on that, that the entire system itself was well known or routine or conventional. And that's just inappropriate in Step 2 of the analysis. Under Atrix and Berkheimer, you know, Berkheimer tells us technology that eliminates redundancies, I'm sorry, I'm out of time. No, please finish your thought. Sure. Thank you, Your Honor. And Berkheimer told us that technology that eliminates redundancies, such as multiple visits and improving system efficiency here, or reducing errors in the molding process here, can transform an abstract idea into a patent-eligible concept. And I referenced Atrix, and the allegations at a minimum raise factual disputes regarding the 101 analysis, such as whether these things are conventional, well known, or routine. So while we don't think that this court needs to reach the merits of the analysis at all, because we think that the District Court just misapplied the proper legal standards and ruled it out, certainly we don't think this patent is directed to an abstract idea, but even if so, at a minimum, there are factual questions that the District Court inappropriately resolved on its own, without crediting the allegations in our complaint, in our patent. Thank you, Your Honors. Okay. Thank you. Anything else that the panel would like to raise? No. Okay. Thanks to both counsel. The case is taken under submission. And that concludes this panel's argued cases for this morning. The Honorable Court is adjourned until tomorrow morning at 10 a.m.